**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

COURTNEY MALONE,                                    Case No. 1:16-cv-1004

                    Plaintiff,                      Black, J.
                                                    Bowman, M.J.
        v.


COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.


**REPORT AND RECOMMENDATION**

        Plaintiff Courtney Malone filed this Social Security appeal in order to challenge
the Defendant's finding that she is not disabled.  *See* 42 U.S.C. §405(g).  Proceeding
through counsel, Plaintiff presents two claims of error for this Court's review.  As
explained below, I conclude that the ALJ's finding of non-disability should be
REVERSED, because it is not supported by substantial evidence in the record as a
whole.

## I.  Summary of Administrative Record

        In March 2013, Plaintiff filed applications for Disability Insurance Benefits ("DIB")
and for Supplemental Security Income ("SSI"), alleging disability beginning January 31,
2013, based on a combination of mental and physical impairments.[1]  After her claim
was denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing
before an administrative law judge ("ALJ").  On June 11, 2015, she appeared with
counsel and gave testimony before ALJ George McHugh; Plaintiff's aunt and a

---

[1]There is evidence of at least one prior unsuccessful application for benefits in the record, but the relevant
date of the prior application(s) are neither clear, nor material to this case.

1

vocational expert also testified. (Tr. 35-101). On July 28, 2015, ALJ McHugh issued an adverse written decision, concluding that Plaintiff was not disabled. (Tr. 15-26).

Plaintiff was 29 years old when she filed her application, and remained in the younger individual age category at the time of the ALJ's decision. She has a high school education, with past relevant work at the light, semi-skilled level as a Child Care Leader. She is insured for DIB purposes only through June 30, 2015.

The ALJ specifically determined that Plaintiff suffers from the following "severe" impairments: "degenerative disc disease of the lumbar spine; bipolar disorder, type II; attention deficit disorder/attention deficit hyperactivity disorder; affective disorders; anxiety disorders; and chronic interstitial cystitis. (Tr. 17). In addition to those severe impairments, the ALJ considered, but determined as "non-severe," Plaintiff's history of treatment for polysubstance abuse. (Tr. 18). The ALJ next determined that none of Plaintiff's impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff was entitled to a presumption of disability. (Tr. 18). Instead, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform work at a light level, subject to the following limitations,

> (1) Limited to lifting and carrying up to 20 pounds occasionally, and up to 10 pounds frequently; (2) walking or standing up to 6 hours; (3) sitting up to 6 hours; (4) frequent stooping, kneeling, crouching and crawling; (5) no commercial driving as part of job duties; (6) limited to performing simple, routine, and repetitive tasks, but not at a production rate pace or strict quotas; (7) no exposure to dangerous hazards such as unprotected heights or dangerous equipment; (8) occasional interaction with supervisors, co-workers, and the public; (9) limited to simple instructions and simple work-related decisions; (10) limited to a static work environment, with few changes in the work setting; (11) no teamwork or tandem tasks; and (12) in addition to normal breaks, off-task 10% of the workday and absent 1 day a month.

(Tr. 20). Based upon the testimony of the vocational expert, the ALJ found that, although Plaintiff could not perform her past job, she could still perform a number of unskilled jobs that exist in significant numbers in the national economy, including the representative occupations of cleaner, packager, and label inspector. (Tr. 25). Therefore, the ALJ concluded that Plaintiff is not under a disability. The Appeals Council denied review, leading Plaintiff to file this judicial appeal.

In her Statement of Errors, Plaintiff argues that the ALJ erred by: (1) failing to properly evaluate Plaintiff's interstitial cystitis; and (2) failing to properly evaluate the medical opinion evidence regarding her mental limitations. For the reasons explained below, I recommend reversal and remand for further review of the evidence.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a

3

whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v.  Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she

suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job.  42 U.S.C. § 423(d)(1)(A).

### B.  Plaintiff's Claims of Error

### 1.  Plaintiff's Interstitial Cystitis

The ALJ found that Plaintiff has a medically determinable severe impairment of interstitial cystitis ("IC").  Plaintiff argues that the ALJ's decision must be reversed in part because he failed to cite to SSR 15-1p, which provides guidance on the evaluation of IC.  *Id.*, 2015 WL 1292257 (S.S.A. March 18, 2015), as corrected at 2015 WL 1642778 (S.S.A. April 9, 2015).[2]

An ALJ's failure to cite to a social security ruling will never constitute reversible error, as "the ultimate issue is not whether the ALJ included a rote citation, but whether he complied with the regulatory scheme." *Cain v. Com'r of Soc. Sec.*, 2016 WL 8604322, at *4 (S.D. Ohio, 2016), adopted at. 2017 WL 1102681 (S.D. Ohio, 2017); *see also Allen v. Com'r of Soc. Sec.*, 2016 WL 6471092, at *3 (W.D. Mich., 2016). "'While SSR's do not have the force of law, they are an agency's interpretation of its own regulations and "entitled to substantial deference and will be upheld unless plainly erroneous or inconsistent with the regulation.'" *Id.*, citing *Kornecky v. Com'r of Soc. Sec.*, 167 Fed. Appx. 496, 498 (6th Cir. 2006).  For the most part, the record supports the ALJ's evaluation of the degree of limitation caused by Plaintiff's IC, including the intensity, persistence, and limiting effects of her condition.  *Contrast Chavis v. Astrue*, 2012 WL 5306130 (S.D. Ohio Oct 26, 2012) (remanding where ALJ not only failed to cite SSR, but failed to include *any discussion at all* of plaintiff's IC, including discussion

---

[2]SSR 15-1p.rescinded and replaced SSR 02-2p "Title II and XVI: Evaluating Cases Involving Interstitial Cystitis."

of the intensity, persistence and limiting effects of that condition).  On the other hand, because remand is required concerning Plaintiff's mental limitations, because a treating psychiatrist testified to the interplay between physical and mental impairments, and because the evidence suggests a possible increase in Plaintiff's IC-related symptoms over time, the Commissioner also should re-evaluate the related level of physical impairment on remand.

Plaintiff testified that she cannot work because she has to go to the bathroom at least every 30 minutes, with painful urination.  (Tr. 51).  She testified that going to the bathroom itself takes twenty minutes, meaning that she spends a significant part of her day "liv[ing]" in the bathroom.  (Tr. 77; *see also* Tr. 51).  Plaintiff's aunt, a third party witness only partially credited by the ALJ (Tr. 23), testified she would "guess" that her niece took bathroom breaks every hour to an hour and fifteen minutes, which could take 10 to 15 minutes.[3]  (Tr. 90).  The vocational expert testified that lengthy bathroom breaks that lasted for "15 minutes, or so" every hour throughout the workday "would eventually preclude employment without [an] accommodation of some kind."  (Tr. 96).  However, SSR 15-1p makes clear that "we cannot determine that a person who has IC is disabled on the basis of his or her statement of symptoms alone."  *Id.*, 2015 WL 1292257, at *2.  The ALJ discounted the majority of Plaintiff's subjective complaints based upon his adverse credibility finding.  (Tr. 21).  The ALJ reasoned that although Plaintiff testified to

---

[3]Plaintiff's aunt attributed the need for bathroom breaks to a diagnosis of pelvic floor disorder.  Several records suggest that Plaintiff's diagnosis may have been changed to a diagnosis of pelvic floor disorder and/or endometriosis approximately a month before her June 2015 hearing.  (*See, e.g.*, Tr. 969 ("[Plaintiff] recently learned she does not have interstitial cystitis…[S]he had a cystoscopy several days ago and learned that she actually has a pelvic floor disorder"); Tr. 1317 (reference to pelvic floor dysfunction), Tr. 1459 (reference to a diagnosis of pelvic pain syndrome which was later to be found to be endometriosis).

> needing to go to the bathroom every 30 minutes or less, every day, like clockwork[,]…she sat in the hearing room and testified for an hour, without a bathroom break, and yet showed no discomfort or urgency to go to the bathroom. Moreover, it appears that absent a flare in her genital herpes or a urinary tract infection, the claimant has generally denied experiencing any urgency or frequency in her urination. Given the numerous inconsistencies with the claimant's testimony, she is only partially credible at best.

(Tr. 22).

That ALJ's adverse credibility finding is strongly supported by the record in this case. Plaintiff first sought treatment for symptoms on March 14, 2013, after experiencing painful urination for just 2 days. At that time, she denied any problem with urinary frequency. (Tr. 18; Tr. 685, admitting painful urination but denying frequency or urgency). Her physician prescribed medication and encouraged her to follow up if her symptoms did not improve. The record reflects no further related complaints for more than sixteen months, until July 28, 2014. In fact, it was not until two years later, in March 2015, that Plaintiff was diagnosed with *chronic* interstitial cystitis and dysuria (painful urination) after reporting symptoms lasting – at that time - for one month.

SSR 15-1p explains that IC is a "complex genitourinary disorder involving recurring pain or discomfort in the bladder and pelvic region." The ruling defines IC as: "An unpleasant sensation (pain, pressure, discomfort) perceived to be related to the urinary bladder, associated with lower urinary tract symptoms of *more than six weeks duration, in the absence of infection or other identifiable causes.*" *Id.* at *2 (emphasis added). Symptoms vary in both kind and intensity. *Id.* As with fibromyalgia and other complex disorders, SSR 15-1p emphasizes the need to evaluate longitudinal evidence "because symptoms, signs, and laboratory findings of IC may fluctuate in frequency and severity and may continue over a period of months or years." *Id.*

7

> Longitudinal clinical records reflecting ongoing medical evaluation and treatment from the person's medical sources, especially treating sources, are extremely helpful in documenting the presence of any signs or laboratory findings, as well as the person's limitations over time. The longitudinal record should contain medical observations, information about treatment, the person's response to treatment, and a detailed description of how the impairment affects the person's ability to function.

*Id.*, at *5.   Here, noting that Plaintiff's symptoms of frequent urination appeared to be "intermittent at best," (Tr. 19), the ALJ found that her "chronic, albeit intermittent, bladder/urinary symptoms…appear[ed] to respond well to antibiotics, and would not reasonably be expected to require her to be off task more than 10% of the workday." (Tr. 23).

Plaintiff contends that the ALJ failed to adequately consider Plaintiff's chronic pelvic pain, her disrupted sleep, and her reported symptoms of urinary frequency and urgency. (Doc. 10 at 13).   Contrary to the ALJ's assessment, she complains her symptoms did not respond well to treatment, and that the ALJ's statement that she has "generally denied experiencing any urgency or frequency to her urination" (Tr. 22) is "a complete misstatement of the record evidence."  (Doc. 10 at 14).   However, I find the existence of substantial evidence to support the ALJ's analysis of the longitudinal record of Plaintiff's IC symptoms for at least the first two years of the alleged disability period, although the most recent evidence is more equivocal.

 Plaintiff does not directly challenge the adverse credibility finding made in this case, though she faults the ALJ for citing her ability to testify for an hour during the hearing, based upon "reasonable" variations of her symptoms from day to day.  (Doc. 10 at 14).   However, at the hearing Plaintiff remained insistent that she spends a significant portion of each day in the bathroom, and needs to go at least every thirty minutes.   As the ALJ pointed out, not only was her testimony inconsistent with her

hearing behavior, but it was extremely inconsistent with other testimony concerning her daily activities.  (Tr. 21).

Ample evidence supports the ALJ's conclusion that Plaintiff appeared to "exaggerate her symptoms and complaints of pain," and provided responses to questions that seemed to reflect "an effort to shock the audience or get attention."  (Tr. 21).  For example, there were multiple discrepancies in the record between Plaintiff's complaints about her "broken back" and years of records in which she denied any symptoms or limitations.  Plaintiff testified that she only leaves her house twice per week for doctor's appointments, but other testimony reflected that she drives herself (and others) to "daily AA meetings, daily church services, [attends] 3 chiropractor visits every week, walks her dogs, goes window shopping at the mall, and visits her Aunt in Cincinnati 2 times a month."  (Tr. 21).  *Accord Landefeld v. Com'r of Soc. Sec.*, 2016 WL 304499 at *2 (S.D. Ohio Jan 26, 2016) (affirming non-disability finding where ALJ discounted Plaintiff's subjective reports of disabling limitations from fibromyalgia in light of multiple inconsistencies in the record, contradictory reports from Plaintiff, strong evidence that Plaintiff exaggerated her symptoms, and absence of objective support or clinical records that supported her alleged level of limitation).

Plaintiff's citations in support of additional IC limitations does not demonstrate reversible error.  Plaintiff relies upon evidence that she "was seen at least five times for symptoms of painful urination and frequency."  (Doc. 15 at 1).  However, the cited records reflect short time periods of inconsistent complaints, namely her initial report on 3/14/13, 7/28/14, 10/28/14-11/10/14, and 2/25/15-3/9/15.  Her complaints of symptoms all appear to co-exist with diagnoses of infections, and appear to have been separated by relatively long asymptomatic periods.

9

Even in the records cited by Plaintiff in this appeal, she frequently denies the type of limiting pain, frequency, and urgency symptoms to which she testified at the hearing. *See, e.g.*, Tr. 781 (7/28/14 report of "itching and burning some painful urination" for 3-day period, with diagnosis not of IC but of UTI and yeast infection/vaginitis with "no c/o [complaints of] dysuria, urinary frequency, etc."); Tr. 782 (7/28/14 report "denies" abdominal pain, flank pain and frequent urination); Tr. 831 (10/28/14 UTI with symptoms for 2 days of painful urination and frequency but no urgency, antibiotics prescribed); Tr. 833 (10/28/14, denies painful urination urgency or frequency); Tr. 827-828 (11/10/14, recently treated for UTI, continued complaints of painful and frequent urination, prescribing new abx for recurrent UTI; but same record "denies" sleep disturbance. frequent, urgent, or painful urination); Tr. 831-833 (10/28/14, UTI for 2 days with painful urination, but also denies sleep disturbance, or painful, frequent or urgent urination). In addition, many other medical records reflect wholesale denials of any type of persistent symptoms of sleep disturbance, urination pain, frequency or urgency. *See, e.g.*, Tr. 693 (9/24/13, reporting her only physical complaint as asthma); Tr. 791 (11/13/13); Tr. 786-787 (2/20/14), Tr. 706 (3/17/14), 781-783 (7/28/14); Tr. 827-828 (11/10/14, denying symptoms).

However, the undersigned recognizes that portions of the record suggest an increase in reported symptoms over time. *See* Tr. 823 (complaining of urinary frequency to her PCP on 2/25/15 for "couple of weeks" with current herpes outbreak but denying sleep disturbance); Tr. 825 (2/25/15 record reflecting primary diagnosis of UTI, along with painful and frequent urination, and genital herpes). Like the earlier records, the 2015 records reflect inconsistencies and co-existing infections. *See e.g.*, Tr. 923 (3/3/15 diagnosis of another UTI); Tr. 820-821 (follow-up on 3/5/15 reflects report of

urethral pan for 1 month but "denies" sleep disturbance, abdominal pain, urinary frequency or urgency); Tr. 909 (3/5/15 noting complaint of urethral pain that could be IC or post-herpetic neuralgia); Tr. 911 (diagnosis of yeast infection on 3/4/15, medication expected to resolve symptoms); Tr. 892 (3/9/15, called in complaining of increased pelvic pain over weekend); Tr. 896 (patient reported pain "decreased today" with prescribed medication, still bothered by frequency, advised to f/u with gynecologist and pain clinic as needed);  Tr. 900-901, 903 (calls 3/5/15 and 3/9/15 stating she was recently diagnosed with IC and requesting narcotics, prescription refused as inappropriate for IC, note reflects Emergency Department also refused narcotics previous day for same complaints and that plaintiff refused alternative ED treatment; physician agreed to refer to pain clinic only after plaintiff again refused prescribed treatment).

In March 2015, a specialist diagnosed chronic IC "with possible superimposed postherpetic neuralgia," prescribing treatment of multiple doses of DMSO to be administered over a six-week period.  Prior to her second DMSO treatment that same month, her physician advised her that most patients "notice improvement half way through the [DMSO] treatment."  (Tr. 904).  In mid-March 2015, Plaintiff complained of severe abdominal pain - not from IC - but from constipation.  (Tr. 881, patient called 3/16/15 requesting pain medication which was declined, reported having gone to ER same morning for constipation).

In April 2015, Plaintiff again was seen for complaints of pain.  However, the examining physician noted ongoing DMSO treatment and advised her to follow up with her treating urologist if her symptoms persisted.  In the same record, she expressly denied sleep disturbance or painful, frequent, or urgent urination.  (*See* Tr. 1010-1012).

11

In fact, in April 2015 Plaintiff was complaining of more severe pain with her menstrual cramps, which reportedly caused her to "black out." (Tr. 1014). Plaintiff underwent a third DMSO treatment on April 9, 2015. (Tr. 869). Other April records reflect that she reported IC pain, but failed to comply with prescribed treatment, and refused an ultrasound. (Tr. 862, 866). A physician advised that if she did not comply with treatment, she would not obtain relief. (Tr. 866).

In sum, the longitudinal record reflects symptoms during discrete, short time periods, with inconsistencies in reported symptoms and frequent denials of any severe or disabling symptoms from IC. Contrary to Plaintiff's argument, neither SSR 15-1p nor any other authority required the ALJ to find that, because she was first diagnosed with IC in March of 2013,[4] her symptoms remained at a continuous and disabling level. Plaintiff's referral to a pain clinic does not prove otherwise. That referral occurred only after Plaintiff was refused narcotic medication and refused to comply with alternative prescribed treatment for her IC symptoms. In addition, when Plaintiff was finally evaluated by the pain clinic in May 2015, she reported that her pelvic pain had only begun only "5 months ago" and was caused by "pelvic floor dysfunction." She reported "positive results" from recently prescribed pelvic floor therapy. (Tr. 1317; *see also* Tr. 909, 1015).

It is also worth noting that Plaintiff reported significantly more pain to the pain clinic from a multitude of conditions, including sleep disturbance, back pain, muscle cramps, radicular pain, and pain and instability in both legs. (Tr. 1317-1318). She was observed to have suprapubic tenderness to palpation, but otherwise was in no acute

---

[4]At that time she had reported just 2 days of symptoms and was diagnosed with a UTI. The duration of reported symptoms in March 2013 and UTI diagnosis at that time contrast with the stated definition of IC in SSR 15-1p, which requires six weeks of symptoms and the absence of infection or other cause.

distress, with a full examination yielding normal results. (Tr. 1323). Her positive opioid history was noted, and the clinic prescribed nerve blocks and pelvic floor therapy as well as cognitive behavioral therapy, with a plan to "consider interventions to decrease the opioid dependency" and to wean off those medications "along with a referral to a drug rehabilitation center when clinically appropriate." (Tr. 1328). She was directed to report back in 10 days to allow time for the pain clinic to obtain lab results of urine testing. However, there are no further records from the pain clinic to indicate whether she followed through on treatment.

Nevertheless, in light of the required remand on Plaintiff's second claim, and giving Plaintiff the benefit of the doubt, the undersigned recommends further review of the evidence of her IC and/or pelvic pain and urinary frequency symptoms. The record suggests a possible increase in reported (though still inconsistent) symptoms a few months prior to her hearing. *See* Tr. 877 (3/26/15) seeking medication adjustment due to excessive dry mouth and urinary frequency at night); *but contra* Tr. 816-818 (3/26/15, admits to frequency but denies sleep disturbance, painful or urgent urination); Tr. 994 (5/10/15, denial of symptoms); Tr. 719 (6/15/15, "no abdominal pain….no difficulty urinating, no hematuria, and no increased frequency").

### 2. Medical Opinion Evidence: Mental Limitations

Social security regulations generally require the Commissioner to give the greatest weight to the opinions of treating physicians, with less weight given to the opinions of any examining consultant, and the least amount of weight given to non-examining consultants. *See* 20 C.F.R. §404.1527(d)(1) and (d)(2); *Farthing v. Com'r of Soc. Sec.*, 107 F. Supp.3d 839 (S.D. Ohio 2015). In this case, the ALJ did precisely the opposite, giving the greatest amount of weight to non-examining consultants who

reviewed an incomplete record. Such a departure from regulatory presumptions does not *necessarily* constitute error, so long as the ALJ provided "good reasons" for failing to give controlling weight to the opinions of the treating physician, and his analysis and decision is otherwise supported by substantial evidence in the record as a whole. Here, however, remand is required because the ALJ failed to articulate "good reasons," and the undersigned cannot find substantial evidence to support the ALJ's analysis. Instead, the record reflects reversible error under *Blakley v. Com'r of Soc. Sec.*, 561 F.3d 399, 406 (6th Cir. 2009) and *Gayheart v. Com'r of Soc. Sec.*, 710 F.3d 365, 375-376 (6th Cir. 2013).

Plaintiff has difficulty with concentration. (Tr. 67). Plaintiff's treating psychiatrist of three years, Dr. Moss, opined on June 9, 2015 that Plaintiff's ability to maintain attention and concentration was impaired at the "moderately severe" level, defined as "able to perform designated task or function, but has or will have noticeable difficulty (distracted from job activity) more than 20% of the work day…." (Tr. 1455, emphasis added). In addition to that opinion, Dr. Moss opined that Plaintiff had multiple other "moderately severe" (arguably work-preclusive) limitations. (Tr. 1455-1456). He also stated that she would be unable to sustain work because she would be unable to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. *Id.* Consistent with the latter opinion, he opined that she would be absent more than four days per month. *Id.*

Dr. Moss's opinions were rendered within a few weeks of three back-to-back psychiatric hospitalizations in April and May 2015. (Tr. 954-970, 985-988, 1174-1176). Even Plaintiff concedes that she "was clearly experiencing a decline in mental health" at the time that Dr. Moss rendered his opinions. (Doc. 10 at 17). In an accompanying

narrative report, Dr. Moss states that Plaintiff is unable to work "at this time," leaving some ambiguity as to the time frame to which his opinions apply.[5] The narrative acknowledges that Plaintiff "was able to achieve a period of stability and had sustained episodes of sobriety over these past three years," but cautions that "[o]ver the past four months,…[she] has had substantial difficulty maintaining stability of mood." (Tr. 1459, emphasis added). Dr. Moss explains that Plaintiff's exacerbation of symptoms "has been complicated by [her] ongoing chronic pelvic pain syndrome which was later to be found [to be] endometriosis." (*Id.*) He references two of her hospitalizations in May 2015, for suicidal ideation and manic behavior. Following her discharge, her medications were adjusted "which has shown to help her symptoms reduce to some degree," but he states she is still "not in a position to be able to manage herself in a work-like environment" the type of "consistency" that would enable her "to maintain any form of employment, though the patient has attempted to do so." (Tr. 1459). He explains:

> She has substantial decompensation in her ability to maintain task, has poor task stamina, struggles even with completion even of computerized testing. Patient has unstable mood and struggles in her ability to maintain productive standards throughout the day. At this time, I do not believe the patient is in a position to be able to maintain employment.

(*Id.*)

Dr. Moss emphasizes that Plaintiff's level of impairment is worsened by the interplay between her mental and physical symptoms. Despite the ALJ's inclusion of a limitation that Plaintiff be "off-task 10% of the workday and absent 1 day a month" to accommodate both the potential need for bathroom breaks and her mental impairment,

---

[5]In addition, his opinion on the ultimate issue of disability is not considered to be a medical opinion that should be afforded any particular weight, since that issue is reserved to the Commissioner.

the ALJ failed to discuss the interplay between her impairments. By contrast, Dr. Moss describes the dynamic as follows:

> [She] also demonstrates a degree of somatic concerns that is unusual even in light of her newly diagnosed endometriosis. There is a ruminative preoccupation with physical functioning and health matters and severe impairment arising from somatic symptoms. These somatic complaints are likely to be chronic and accompanied by fatigue and weakness that renders her incapable of performing even minimal role expectations. She reports that her daily functioning has been compromised by numerous and varied physical problems. She feels her health is not as good as that of her age peers and likely believes that her health problems are complex and difficult to treat successfully. She reports particular problems with the frequent occurrence of various minor physical symptoms (such as headaches, pain, or gastrointestinal problems) and has vague complaints of ill health and fatigue. Her social interactions and conversations tend to focus on her health problems, and her self-image may be largely influenced by a belief that she is handicapped by her poor health.

(Tr. 1460).

Rejecting nearly all of Dr. Moss's opinions, the ALJ determined that the evidence "does not suggest or establish that the claimant lacks suitable concentration, memory, adaptive, basic cognitive or interpersonal skills for vocational involvement that is simple and routine in nature." Accordingly, he limited her to "simple, routine, and repetitive tasks, but not at a production rate pace or strict quotas." (Tr. 20). In formulating Plaintiff's mental RFC, the ALJ also discounted the opinions of an examining consultant, Dr. Johnson. (Tr. 22).

In contrast to Dr. Moss's work preclusive mental RFC limitations, the ALJ found Plaintiff could still follow "simple instructions and simple work-related decisions" in a "static work environment with few changes," with "no teamwork or tandem tasks." (Tr. 20). And he included the referenced limitation that Plaintiff would be "off-task" for 10% of the workday. *Id.* In formulating that mental RFC, the ALJ explained that he was

giving the least weight to Dr. Moss, "less weight" to Dr. Johnson, and the greatest weight to the opinions of non-examining consultants.[6] (Tr. 22).

If a treating physician's opinions are not "well-supported" and are inconsistent with other substantial evidence in the record, then the ALJ need not give those opinions controlling weight. Here, the ALJ found that Dr. Moss's opinions suffered from both defects. However, the ALJ's reasons do not constitute "good reasons." The ALJ specifically discounted Dr. Moss's opinions as

> speculative at best, and not well supported by his own clinical examination findings (nor those of other examining and treating mental health professionals).

(Tr. 23). Additionally, the ALJ cited "the greater weight of the medical evidence in the claimant's current record" as inconsistent with Dr. Moss's opinions. (*Id.*) However, the opinions of non-examining consultants appear to constitute the bulk of the cited "greater weight of the medical evidence" relied upon by the ALJ. In that respect, the ALJ's analysis constitutes reversible error. *See Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (Rejecting a medical opinion solely because a consulting physician disagrees is not an adequate basis for rejecting a treating physician's opinion).

In *Gayheart v. Com'r*, the Sixth Circuit reversed where the ALJ appeared to give greater scrutiny to the treating source opinion than to the opinions of the non-examining consulting psychologists. The Sixth Circuit explained the problem with using the opinions of a non-examining consultant as the primary basis to discredit the opinions of a treating physician:

> Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise

---

[6]The only significant difference between the non-examining consulting opinions concerning Plaintiff's mental RFC and the ALJ's determination was the addition of the 10% "off-task" functional limitation.

the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Gayheart*, 710 F.3d at 377.

Another problem with the ALJ's analysis is that, in contrast to the opinions of Dr. Moss, the non-consulting opinions were rendered early in the record.  Two of the opinions dated from 2011, prior to the date of alleged disability onset.  (Tr. 112).  The latest was dated January 15, 2014. (Tr. 177).  Thus, the non-examining consultants did not have access to the most significant portion of Plaintiff's mental health records, including but not limited to the opinions of Dr. Moss – a critical fact that went unmentioned by the ALJ.

The ALJ's failure to explain why he believed that non-examining consultants, who did not have access to so much of Plaintiff's mental health records, should be given greater weight than more recent examining and treating opinions, also violates *Blakley v. Com'r of Soc. Sec.*  In that case, the Sixth Circuit confirmed the general principle that in "appropriate circumstances," opinions from consultants "may be entitled to greater weight than the opinions of treating or examining sources."  *Blakley*, 581 F.3d at 409, quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)).  However, the Sixth Circuit reversed because the state non-examining sources did not have the opportunity to review "much of the over 300 pages of medical treatment...by Blakley's treating sources," and the ALJ failed to indicate that he had "at least considered [that] fact before giving greater weight" to the consulting physician's opinions.  *Id.*, 581 F.3d at 409 (*quoting Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007)).  Under *Blakley*,

then, the ALJ was permitted to credit the non-examining consulting opinions, but only if he articulated sufficient reasons for doing so.  He did not.

The ALJ did reason (in part) that Plaintiff's brief psychiatric hospitalizations all occurred when she stopped her medications and relapsed on alcohol, that she obtained positive benefits from outpatient therapy and psychotropic medications, and that when compliant with her prescribed treatment, she performed many tasks and consistently engaged in a wide range of daily activities.  (Tr. 23).  While the record supports a portion of that reasoning, the existence of the referenced *Gaylord* and *Blakley* errors requires remand.

On remand, the  ALJ should also reconsider Dr. Johnson's opinions, as his dismissal of those opinions as overly reliant on "the claimant's self-reported limitations" is also somewhat problematic.  A trained psychologist presumably uses diagnostic interview techniques when eliciting responses to a clinical interview.  Moreover, one of the primary limitations discounted by the ALJ (Plaintiff's inability remain on-task) relied not on Plaintiff's report, but on Dr. Johnson's own clinical observations.[7]

### III.  Conclusion and Recommendation

This matter should be remanded for further proceedings consistent with this Report and Recommendation. A sentence four remand under 42 U.S.C. § 405(g) provides the required relief in cases where there is insufficient evidence in the record to support the Commissioner's conclusions and further fact-finding is necessary.  *See Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994)

---

[7]In her September 24, 2013 report, Dr. Johnson described Plaintiff as "fleetingly able to concentrate on questions and tasks." (Tr. 697).  Like the timing of Dr. Moss's opinions, the date of Dr. Johnson's report appears close in time to an exacerbation of Plaintiff's symptoms, when she was referred for a brief period of partial hospitalization. (Tr. 848).

(citations omitted).  In a sentence four remand, the Court makes a final judgment on the Commissioner's decision and "may order the Secretary to consider additional evidence on remand to remedy a defect in the original proceedings, a defect which caused the Secretary's misapplication of the regulations in the first place." *Faucher*, 17 F.3d at 175. All essential factual issues have not been resolved, and the current record does not adequately establish Plaintiff's entitlement to benefits.  *See id.*, 17 F.3d at 176.

Therefore, IT IS RECOMMENDED THAT:

1.  The decision of the Commissioner to deny Plaintiff DIB benefits be REVERSED and this matter be REMANDED under sentence four of 42 U.S.C. § 405(g) consistent with this Report and Recommendation;

2.  As no further matters remain pending for the Court's review, this case be CLOSED.

*/s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

COURTNEY MALONE,                                    Case No. 1:16-cv-1004

           Plaintiff,                              Black, J.
                                                   Bowman, M.J.
   v.


COMMISSIONER OF SOCIAL SECURITY,

           Defendant.


**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).